**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-1444**

SUSAN ENGLER,

            Plaintiff – Appellant,

      and

JACQUELINE HAMRICK; ANTOANNA ROMANIUK,

            Plaintiffs,

      v.

HARRIS CORPORATION,

            Defendant – Appellee,

      and

HARRIS RF COMMUNICATIONS DIVISION (HARRIS RFCD),

            Defendant.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  George L. Russell, III, District Judge.
(1:11-cv-03597-GLR)

Argued:  September 16, 2015          Decided:  October 8, 2015

Before WILKINSON, NIEMEYER, and DUNCAN, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED**: James R. Klimaski, KLIMASKI & ASSOCIATES, P.C., Washington, D.C., for Appellant. Lynn E. Calkins, HOLLAND & KNIGHT, LLP, Washington, D.C., for Appellee. **ON BRIEF**: John P. Racin, Lynn I. Miller, KLIMASKI & ASSOCIATES, P.C., Washington, D.C., for Appellant.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this Title VII action Susan Engler claims that her former employer, Harris Corporation ("Harris"), discharged her as part of a reduction in force ("RIF") because she complained to Harris management about gender discrimination in the workplace. The district court entered summary judgment in Harris's favor, concluding that Engler failed to present sufficient evidence to establish that Harris's legitimate, nondiscriminatory reasons for dismissing her were pretextual. Finding no error, we affirm.

I.

A.

On September 5, 2006, Engler began working for Harris as a first-level contracts manager in Harris's Columbia, Maryland office. Harris is a defense contractor and communications and information technology company headquartered in Rochester, New York. Harris hired Engler to support the Communications Security Products ("CSP") group within the company's RF Communications Division ("RFCD"). Engler is the only contracts manager ever employed in the Columbia office. Harris created the position anticipating an increase in CSP business from U.S. Department of Defense contracts.

During the first year of her employment, Engler created an informal meeting group called "Women in Business." The

3

organization served as a support system for female employees seeking career advancement within the company. In August 2008, several women in the group asked Engler to speak with RFCD's president Dana Mehnert about "mistreatment by the male employees." J.A. 1116-17. Engler relayed the grievance to her immediate supervisor Paul Wilson, who subsequently brought the issue to Mehnert's attention. Mehnert ordered an internal investigation of the matter in March 2009.

Meanwhile, CSP's anticipated surge in Defense Department business failed to materialize. RFCD reported a thirty-seven percent drop in sales for the first three quarters of 2009. From January 2009 to March 2009, RFCD decreased its projected revenue for the upcoming fiscal year by nearly $200 million. In May 2009, RFCD forecast a $230 million reduction in revenue from Department of Defense contracts. J.A. 198.

In light of these economic challenges, Harris executives determined that "significant restructuring" through the use of a RIF was necessary. J.A. 199. Harris considered 1,900 RFCD employees for inclusion in the RIF. To evaluate those individuals, Harris utilized a process known as Banding Analysis, which organized employees according to job function and assigned scores associated with a number of criteria: customer and program experience, job performance, skill criticality and versatility, technical and professional

4

knowledge, leadership skills, and anticipated contributions. J.A. 627. After the Banding Analysis identified the layoff selections, Harris conducted an additional statistical investigation known as Adverse Impact Analysis to confirm that the Banding Analysis did not have a disproportionate effect on a protected class.

Harris considered two RFCD contracts managers for inclusion in the RIF -- Engler and a male senior contracts manager from the Rochester office. Harris executives believed it economically imprudent to retain both positions; other personnel were capable of absorbing any work that could not be accomplished by a single manager. The contracts manager in Rochester held a position one level senior to Engler, received a higher Banding Analysis score, and had at least two more years of experience.

Ultimately, Harris dismissed a total of 179 employees as a result of the RIF. Ninety-seven of those employees were involuntarily released -- seventy-one men and twenty-six women. Engler was one of six people, four men and two women, discharged from the Columbia office. J.A. 628.

B.

In her Title VII suit Engler pressed claims of age and gender discrimination as well as retaliation on the part of Harris for Engler's complaints to her immediate supervisor about gender discrimination in the Columbia office. The district court

5

granted summary judgment to Harris on all counts. On appeal, Engler challenges only the district court's decision to award summary judgment to Harris on her retaliation claim. We review a district court's grant of summary judgment de novo, viewing all facts and reasonable inferences therefrom "in the light most favorable to the party opposing summary judgment." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 601 (1986) (internal quotation marks omitted); see Smith v. Gilchrist, 749 F.3d 302, 307 (4th Cir. 2014).

## II.

Title VII prohibits an employer from "discriminat[ing] against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a) (2012). Plaintiffs can prove Title VII violations either through direct or circumstantial evidence of retaliatory animus. The basic proof schemes for discriminatory and retaliatory animus are much the same. See Adams v. Anne Arundel Cnty. Pub. Sch., 789 F.3d 422, 430 (4th Cir. 2015). In this case Engler did not offer direct evidence of retaliation, and the district court thus assessed her claim under the familiar McDonnell Douglas framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The initial burden rests on the plaintiff to make out a prima facie case of discrimination or, as in this case, of retaliation by

6

demonstrating "(1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2004). If the plaintiff does so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. McDonnell Douglas, 411 U.S. at 802. The plaintiff is then afforded an opportunity to prove that "the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Even assuming arguendo that Engler can demonstrate a prima facie case of retaliation, we agree with the district court that Engler failed to present sufficient evidence that Harris's nondiscriminatory reasons for firing her -- Harris's economic reversals and Engler's declining performance -- were pretextual. The Supreme Court has made clear that to be pretextual, a reason must be false and wrongful animus must be "a but-for cause of the challenged employment action." Univ. of Tex. Sw. Med. Ctr. v. Nassar, __ U.S. __, 133 S. Ct. 2517, 2532-34 (2013); see Foster v. Univ. of Maryland-Eastern Shore, 787 F.3d 243, 253 (4th Cir. 2015). Engler has not satisfied that requirement.

Engler asserts that she was terminated because she raised concerns about gender discrimination in the Columbia office.

This bare assertion fails to create an issue of triable fact. As the district court noted, "the CSP group, for which Engler was hired to provide support, was experiencing a downward trend in projected revenue and profit." Engler, 2014 WL 1370320 at *6. Indeed, management had forecast a nearly $200 million decline in revenue for fiscal year 2010. Ante at 2. No less than 179 men and women were laid off. Engler has not put forth any evidence showing that Harris's poor financial outlook was a bogus projection or that terminating her employment was anything other than a legitimate business decision of a company that had fallen on hard times. See Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 513 (4th Cir. 1994) (employment discrimination statutes are "not intended to obstruct the ability of a commercial enterprise to make necessary adjustments in the face of economic challenges.").

Moreover, "Engler's declining performance in the months preceding the RIF is well documented in various email communications." Engler, 2014 WL 1370320 at *7. From late 2008 until the RIF, Harris management expressed concerns about Engler's productivity, efficiency, and willingness to work effectively with co-workers and customers. This court has made clear that "[j]ob performance . . . [is] widely recognized as [a] valid, non-discriminatory bas[is] for any adverse employment

8

decision." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996).

Furthermore, "Engler offers no evidence to establish that the Banding Analysis was not consistently employed as to all employees considered for the RIF." Engler, 2014 WL 1370320 at *7. Engler has failed to place into genuine dispute her belief that she deserved a higher score in the Banding Analysis categories or that on a comparative basis she was a more deserving candidate for retention than the contracts manager who was not dismissed. Simply put, the contracts manager in Rochester "was the better qualified candidate for the position sought" -- he had more experience, a more senior position, and a better Banding Analysis score than Engler. Evans, 80 F.3d at 960; see also id. at 960-61 ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.").

Finally, "Harris employees located in the Rochester office absorbed Engler's duties, and no contracts manager has been hired or assigned to the Columbia office since the RIF." Engler, 2014 WL 1370320 at *8. The fact that other employees could assume additional tasks only bolsters Harris's contention that Engler's position was expendable. See, e.g., Roge v. NYP Holdings, Inc., 257 F.3d 164, 171 n. 2 (2d Cir. 2001). While Engler suggests that it would ultimately have been more cost-

9

effective to retain her position and terminate a different employee in her stead, this court is not empowered to second-guess an employer's personnel decisions so long as they are based on something other than discrimination. See DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) ("when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the court's] province to decide whether the reason was wise, fair, or even correct").

## III.

Based substantially on the reasons given in the district court's opinion, we affirm the judgment entered in favor of Harris on Engler's Title VII retaliation claim.[*]

AFFIRMED

---

[*] The court denies Harris's motion to redact a portion of the oral argument.

10